# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 29, 2025

Lyle W. Cayce
Clerk

———————

No. 24-50160

———————

United States of America,

*Plaintiff—Appellee*,

*versus*

Imad Eddin Wadi,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CR-244-1

———————————————————————

Before Stewart, Clement, and Wilson, *Circuit Judges*.

Cory T. Wilson, *Circuit Judge*:

Following a jury trial, Iman Wadi was convicted of conspiracy to murder and maim persons in a foreign country, 18 U.S.C. § 956, conspiracy to provide and attempt to provide material support to a designated foreign terrorist organization, 18 U.S.C. § 2339B, and conspiracy to provide and attempt to provide material support to terrorists, 18 U.S.C. § 2339A. Wadi appeals those convictions, raising six issues. We affirm.

No. 24-50160

## I.

Iman Wadi, a Syrian-born nationalized United States citizen, planned to establish a halal-beef slaughterhouse in Colombia with business partner Ahmed Barodi. They needed around $13 million in investments to turn their business idea into a reality. Suspicious of their plan, Wadi's friend Hussain Baker (a confidential source for the FBI) reported Wadi and Barodi's plan to his FBI contacts in 2017. At their direction, Baker connected Wadi and Barodi with a "representative" of an FBI-concocted "Kuwaiti Sheikh" who offered to invest in the slaughterhouse.

Through his "representative"—who was really an undercover FBI agent—the Sheikh offered to invest $9 million in Wadi and Barodi's Colombian enterprise, on one condition: Wadi and Barodi would agree to send at least five percent of that investment to Jabhat al-Nusra (at times known as al-Nusra, Fatah al-Sham, and Tahrir al-Sham) to support al-Nusra's violent campaign to overthrow the Syrian government.[1] At the time, al-Nusra was "the outstanding representative of the Salafi-jihadist opposition to the Syrian government" and was designated by the United States State Department as a foreign terrorist organization. *See* 8 U.S.C. § 1189.[2]

---

[1] The Sheikh ostensibly was interested in investing with Wadi and Barodi because Barodi's relatives fought for al-Nusra. The Government presented evidence that Wadi understood Barodi's relatives to have fought for al-Nusra, that Wadi entered the conspiracy on the understanding that the conspirators would be supporting al-Nusra, and that the conspiracy centered around sending money to al-Nusra. There is evidence in the record that Barodi's relatives may actually have fought for Ahrar al-Sham, a distinct organization that has never been designated a foreign terrorist organization by the State Department. Regardless, the Government presented sufficient evidence for a reasonable jury to find that Wadi agreed to finance al-Nusra, rather than Ahrar al-Sham.

[2] Section 1189 authorizes the Secretary of State "to designate an organization a foreign terrorist organization upon finding that: (1) the organization is a foreign

No. 24-50160

Wadi and Barodi agreed to the Sheikh's condition without "hesitation or reservation"; indeed, they had provided such funding in the past. Enthusiastic about the opportunity to do so again, Wadi and Barodi promised the Sheikh that they would send at least five percent of the investment to al-Nusra.[3]  In fact, they attempted to hurry financial support to the Syrian rebels by pressuring the Sheikh to send his investment immediately, concerned more about the rebels' needs than their entrepreneurial venture. Wadi and Barodi were thus fully committed to funding al-Nusra, and they declined to back out of the deal despite being given multiple opportunities to do so by the FBI.

Wadi also understood that his financial support would fund the violence perpetrated by al-Nusra.  At trial, the Government presented evidence that Wadi was informed that al-Nusra was "not a group just for conferences," but for "killing" and that "[t]hey killed [] kids . . . . [and] women like dogs."  The Government also presented evidence that Wadi was aware that al-Nusra was bombing Russian jets and helicopters, blowing up other vehicles, and conducting suicide bombing missions.  So Wadi knew that

_____

organization; (2) the organization engages in terrorist activity; and (3) the terrorist activity or terrorism threatens the security of United States nationals or the national security of the United States."  *United States v. Fidse*, 862 F.3d 516, 519 n.1 (5th Cir. 2017).  The State Department designated al-Nusra as a foreign terrorist organization on May 15, 2014, but on July 7, 2025, the Secretary of State announced the intent to revoke al-Nusra's designation as a foreign terrorist organization.  Press Release, Marco Rubio, Secretary of State, Revoking the Foreign Terrorist Organization Designation of Hay'at Tahrir al Sham (July 7, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/revoking-the-foreign-terrorist-organization-designation-of-hayat-tahrir-al-sham/.  That revocation took effect the next day.  Bureau of Counterterrorism, *Foreign Terrorist Organizations*, https://www.state.gov/foreign-terrorist-organizations/ (last visited Aug. 12, 2025).

[3] At various points during their discussions with the Sheikh's representative, Wadi and Barodi suggested sending even more than that initial figure, including up to 100% of the expected profits from their slaughterhouse.

his financial support would go towards "weapons, guns, and bombs and stuff like that," to subsidize assassinations, killings, and bombings in which al-Nusra was involved.

The confederacy to fund al-Nusra's violent campaign thus hatched, Wadi and Barodi began communicating in code. They established shell businesses through which to wire money, and they opened foreign bank accounts to hide their transfers from American law enforcement. The pair communicated with al-Nusra, informed their contacts that financial support was in the works, and made overtures to Turkish and Ukrainian arms dealers. Wadi and Barodi also pressured the Sheikh to transfer his investment as soon as possible, sending an invoice for $9 million to the Sheikh and repeatedly relaying concerns that al-Nusra was in desperate need of weapons.

In June 2021, the FBI terminated its undercover operation, and Wadi was arrested and indicted for conspiring to murder and maim individuals in a foreign country and for conspiring to send material support to terrorists and designated foreign terrorist organizations. Wadi proceeded to trial in May 2023, and a jury found him guilty on all three counts. The district court sentenced Wadi to concurrent terms of 160 months' imprisonment on each count.

## II.

Wadi now appeals his convictions. He contends that the district court erred by (A) excluding his son's testimony; (B) limiting Wadi's cross-examination of Baker; (C) denying his motion for judgment of acquittal as to conspiracy to murder or maim individuals in a foreign country; (D) refusing Wadi's request for a combatant-immunity instruction; (E) instructing the jury that al-Nusra was a designated foreign terrorist organization; and (F) refusing to sanction the Government for Baker's violation of a court preservation order by either dismissing Wadi's

indictment or giving a spoliation instruction. We address these contentions in turn.

## A.

Wadi asserts that the district court erred by excluding his son Amer's testimony. According to Wadi, Amer's testimony was important to demonstrate Wadi's financial struggles, to refute the Government's suggestion "that [Wadi] was a wealthy terrorism financier," and to support an entrapment defense. At trial, the Government objected to Amer's testifying, arguing that his testimony was "irrelevant," "a plea for sympathy," "based mostly on hearsay," and violative of Federal Rule of Evidence 403 because it was "more prejudicial than probative." *See* Fed. R. Evid. 403. The district court preliminarily sustained that objection, finding that Amer's proposed testimony was "irrelevant" and "more prejudicial than probative." The district court then reaffirmed that ruling after Wadi proffered Amer's testimony.

Wadi contends that the district court's ruling violated his Sixth Amendment right to present a complete defense. "We review alleged violations of that right *de novo*, subject to review for harmless error." *United States v. Lim*, 897 F.3d 673, 684 (5th Cir. 2018). We review rulings on admissibility of evidence for abuse of discretion. *Id.*

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Still, "[a] defendant's right to present relevant evidence . . . is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). "As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials," and "[s]uch rules do not abridge an accused's right to present a defense so long

as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)). Federal Rules of Evidence 401 and 403, which exclude irrelevant evidence and evidence that is more prejudicial than it is probative, serve "legitimate interests in the criminal trial process." *See id.* at 309. Because those rules are not "arbitrary" or "disproportionate to the purposes they are designed to serve," they do not run afoul of the Sixth Amendment. *Rock*, 483 U.S. at 55–56.

As those rules do not violate the Sixth Amendment, we review the district court's admissibility determinations under them for abuse of discretion. *Lim*, 897 F.3d at 684 (citing *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008)). By Wadi's account, the Government presented evidence that he was traveling abroad in numerous countries, procuring lucrative contracts, and carrying a $16 million letter of credit. So he should have been able to offer Amer's testimony about Wadi's weaker financial position to refute the Government's evidence and support his entrapment defense. In other words, according to Wadi, because Amer's testimony would refute the Government's evidence and show that Wadi was more susceptible to the undercover agent's offer of $9 million, it was both relevant and probative. *See* FED. R. EVID. 403 (excluding relevant evidence if its "probative value is substantially outweighed by . . . unfair prejudice").

Even assuming that Amer's testimony was relevant, FED R. EVID. 401(b), Wadi fails to show how the district court abused its discretion by determining that the probative value of Amer's testimony was "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence," FED. R. EVID. 403. Indeed, Wadi was permitted to present evidence and make the argument to the jury that his financial hardship and previous business failures made him more likely to fall prey to entrapment. And Wadi

fails to show how Amer's testimony was not merely "a plea for sympathy," as the Government contends. We find no error in the district court's exclusion of Amer's testimony.

## B.

Similarly, Wadi contends that the district court erred by limiting his cross-examination of Baker. But Wadi's brief points to no instance in the record where the district court actually limited his questioning of Baker. *See* Fed. R. App. P. 28(a)(8)(A); *see also Arredono v. Univ. of Tex. Med. Branch at Galveston*, 950 F.3d 294, 298 (5th Cir. 2020) ("[C]itations to the record on appeal, as required by the federal appellate rules and our local rules, help us parse out the issues that are actually before us on appeal."). Wadi's failure to do so results in forfeiture of this issue. *See, e.g.*, *United States v. Stalnaker*, 571 F.3d 428, 439 & n.9 (5th Cir. 2009) (issues forfeited because brief "d[id] not fully explain them" and "d[id] not cite the record or relevant law"); *see also Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) ("[J]udges are not like pigs, hunting for truffles buried in the record." (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010)) (alteration accepted)). Even if the issue were not forfeited, Wadi fails to demonstrate a violation of his confrontation right because he fails show that "a reasonable jury might have had a significantly different impression of the witness's credibility if defense counsel had been allowed to pursue the questioning" at issue. *United States v. Davis*, 393 F.3d 540, 548 (5th Cir. 2004). This issue thus lacks merit.

## C.

Wadi next asserts that the Government presented insufficient evidence to support his conviction under 18 U.S.C. § 956. That statute criminalizes conspiracies to murder, kidnap, or maim persons beyond the

borders of the United States. 18 U.S.C. § 956(a)(1).[4]  To convict under § 956(a)(1),

> the Government must prove four elements:  "(1) the defendant agreed with at least one person to commit murder[, kidnapping, or maiming]; (2) the defendant willfully joined the agreement with the intent to further its purpose; (3) during the existence of the conspiracy, one of the conspirators committed at least one overt act in furtherance of the object of the conspiracy; and (4) at least one of the conspirators was within the jurisdiction of the United States when the agreement was made."

*United States v. Diaz*, 90 F.4th 335, 342 (5th Cir. 2024) (quoting *United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003)).  Because a jury convicted Wadi under § 956 for both conspiring to murder *and* conspiring to maim, he must successfully attack both findings to succeed in his sufficiency-of-the-evidence challenge.  18 U.S.C. § 956(a)(1) (providing two independent violations for conspiracy to murder and conspiracy to maim); *United States v. Obregon-Reyes*, 507 F. App'x 413, 421 n.3 (5th Cir. 2013) (per curiam) ("[T]he [G]overnment can satisfy the elements of conspiracy to kill, kidnap, or maim in a foreign country without evidence showing a conspiracy to

---

[4] Section 956(a)(1) provides:

Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2).

commit murder—the plain terms of § 956(a) punish conspiracy to commit kidnapping.").

At the conclusion of the Government's case-in-chief, Wadi generally moved for acquittal "on all three counts." But as he pressed that motion in the district court, Wadi neglected his argument that the Government failed to present sufficient evidence to convict him under § 956. Regarding that count, Wadi merely asserted that the Government had not made "a showing of an intent to kill," without any elaboration. Wadi thus did not articulate in his initial motion for acquittal how the Government's evidence was insufficient to show "an intent to kill," and he did not address the Government's alternative § 956 theory, *i.e.*, that the evidence also showed a conspiracy to *maim*, at all. At the close of evidence, Wadi renewed his motion for acquittal, but he still offered no explanation for how the Government's evidence was insufficient to sustain a conviction under § 956 either for conspiring to murder, or for conspiring to maim.

Without making any well-articulated argument in the district court, Wadi debuts a new argument on appeal. According to Wadi, the Government's evidence at best establishes that he and Barodi conspired only to support al-Nusra—not to have al-Nusra commit murder. Wadi contends that any conspiracy to murder was a conspiracy between the members of al-Nusra, not including Wadi or Barodi. Wadi frames his conspiracy as one to finance al-Nusra (it was "simply a weapons deal"); whatever al-Nusra decided to do with the money was a separate conspiracy among its adherents.

"When an insufficiency-of-the-evidence claim of error is properly preserved through a motion for judgment of acquittal at trial, it is reviewed *de novo*." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). But "[t]o preserve *de novo* review, . . . a defendant must specify at trial the particular basis on which acquittal is sought so that the Government and

district court are provided notice." *Id.* "[C]laims not specified at trial are reviewed only under the extremely narrow manifest-miscarriage-of-justice standard." *Id.* at 313. "Such a miscarriage 'exist[s] only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense [i]s so tenuous that a conviction would be shocking.'" *Id.* (quoting *United States v. Knezek*, 964 F.2d 394, 400 n.14 (5th Cir. 1992)). "In making this determination, as with the usual sufficiency standard, we consider the evidence 'in the light most favorable to the [G]overnment, giving the [G]overnment the benefit of all reasonable inferences and credibility choices.'" *Id.* (quoting *Knezek*, 964 F.2d at 400 n.14).

During trial, Wadi did not explain how the Government's evidence was insufficient to demonstrate "an intent to kill," and he made no argument at all that the Government presented insufficient evidence to support a conviction for conspiracy to maim. Moreover, Wadi did not raise the argument that he now makes on appeal, *i.e.*, that he lacked the intent to murder and maim because, at most, he merely conspired to support a separate conspiracy. Because Wadi failed to specify any particular basis for his insufficiency-of-the-evidence contention in the district court, much less the one he raises now, we will set the verdict aside only if it would be a manifest miscarriage of justice not to do so. *Id.* at 312.

Wadi makes no attempt to demonstrate how he might prevail under that standard. And even if he did, Wadi could not show that "the record is devoid of evidence pointing to guilt, or . . . [that] the evidence on a key element of the offense [i]s so tenuous that a conviction would be shocking." *Id.* (quotation marks and citations omitted). Therefore, we find no error in the district court's denial of Wadi's motion for acquittal.

No. 24-50160

**D.**

Wadi maintains that the district court abused its discretion by refusing to instruct the jury on combatant immunity.  Wadi proposed a combatant-immunity instruction before trial, indicating that "[a] separate [m]emorandum of [l]aw w[ould] be provided in support of [that] instruction."  However, no such memorandum justifying the proffered instruction was ever filed.  During trial, Wadi submitted additional proposed instructions, including a generic request that the court "give his proposed combatant immunity instruction" and an objection "to the failure to give this instruction" or "to instruct on combatant immunity at all."  At the close of evidence, the parties had a jury-charge conference, during which there was no mention of a combatant-immunity instruction.[5]  Afterwards, Wadi filed a general written objection to the district court's "refusal to give each and every of Wadi's proposed instructions."

On appeal, Wadi contends that he was entitled to a combatant-immunity instruction because al-Nusra was fighting in the Syrian civil war, which Wadi casts as an international conflict, under the direction and control of Turkey.  Thus, Wadi maintains that al-Nusra was engaged in lawful warfare and entitled to the protections of the Geneva Convention, which precludes murder convictions based upon killings incident to lawful warfare. *See United States v. Hamidullin*, 888 F.3d 62, 66–67 (4th Cir. 2018).

"We need not resolve whether [Wadi preserved] his argument because it fails even under the more rigorous abuse of discretion standard."

---

[5] At oral argument, Wadi's counsel represented to this court that there was no jury-instruction conference and that all discussion between the parties and the court regarding jury instructions were conducted via email between the parties and the district court's law clerk.  But the record clearly indicates that the district court held a jury-charge conference at the close of evidence.

No. 24-50160

*United States v. Martinez*, 131 F.4th 294, 315 (5th Cir. 2025); *see also United States v. Fuchs*, 467 F.3d 889, 900 (5th Cir. 2006) (holding that, given a proper objection during trial, this court reviews a district court's refusal to give a jury instruction for abuse of discretion). Wadi's argument rests upon the premise that the terrorists he conspired to support were engaged in lawful killing as part of legitimate warfare under international law. But there was unrebutted evidence at trial that al-Nusra was committing acts violative of the laws of war. *See* 3 Jens David Ohlin, Wharton's Criminal Law § 47:19 (16th ed. 2024) ("[T]here is no combatant immunity for actions that violate the laws of war, . . . even when performed by privileged belligerents. Therefore, the killing of . . . defenseless, unarmed, and unresisting civilians would constitute murder."). Most plainly, the Government presented evidence that al-Nusra was slaughtering women and children "like dogs" and that Wadi knew of those murders as he conspired to support al-Nusra's activities. By contrast, Wadi offered no evidence that those killings were justifiable acts of lawful warfare. Thus, the district court did not abuse its discretion in declining to give Wadi's requested jury instruction.

## E.

Wadi next argues that the district court violated his Fifth and Sixth Amendment rights by erroneously instructing the jury regarding the alleged conspiracy to "provide[] material support" to a "designated terrorist organization." 18 U.S.C. § 2339B(1).[6] Specifically, he challenges the court's

---

[6] Section 2339B(1) provides:

Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 20 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. To violate this paragraph, a person must have knowledge that the

instruction on the "designation" element. The district court instructed the jury on the § 2339B count as follows:

> For you to find [Wadi] guilty of this crime, you must be convinced that the [G]overnment has proved each of the following beyond a reasonable doubt:
>
> First, that [Wadi] knowingly conspired to provide or attempt to provide material support or resources, including: Currency and monetary instruments (collectively "money") to purchase property, to include: Rifles, grenades, drones and other military equipment, to al-Nusra . . .; and
>
> Second: That [Wadi] . . . did so knowing that al-Nusra . . . is a designated terrorist organization or has engaged in or engages in terrorist activity.

According to Wadi, "[t]his instruction eliminated the second element by supplying the fact of [al-Nusra]'s designation" and thereby "violated [his] constitutional rights."

But the district court properly instructed the jury on every element required by § 2339B. The district court's instruction that al-Nusra had, as a matter of law, been designated a foreign terrorist organization by the Secretary of State did not write that element out of the statute's requirements. *See supra* note 2. Rather, the district court supplied that fact, which is legal in nature, in accordance with this circuit's § 2339B pattern jury instruction and relevant provisions of the United States Code. *See* 5TH CIR. PATTERN JURY INSTRUCTION 2.92B; *see also* 18 U.S.C. § 2339B(1)

_____

organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

(including "provid[ing] material support or resources to a foreign terrorist organization" as an element of the offense); 8 U.S.C. § 1189 (defining the criteria for classifying "an organization as a foreign terrorist organization"); *United States v. Ali*, 799 F.3d 1008, 1028–29 (8th Cir. 2015) (fact of an organization's designation as a foreign terrorist organization is a "statement of the law on which the jury was instructed"). Because the district court's jury instruction substantively tracked the elements of § 2339B, including that, as a matter of law, al-Nusra was at the time a designated foreign terrorist organization, the court did not err, and Wadi's contention to the contrary lacks merit.

## F.

While he was serving as a confidential informant for the FBI on Wadi's case, Baker used a personal cellphone. At Wadi's request, the district court issued a subpoena to Baker on September 28, 2022, requiring Baker to preserve the cellphone and its contents and provide them to Wadi by October 14, 2022. Baker failed to comply, and Wadi filed a motion to compel and for Baker to show cause as to why.

The district court held a show cause hearing in April 2023. At that hearing, Baker agreed to allow a forensic expert to examine his phone but testified that he had gotten a new phone in the interim. According to Baker, "everything should be here [on the new phone]" because the information contained on his old phone "normally . . . moves up to the new phone." Wadi did not object to examining Baker's new phone at that time. Nevertheless, at the pretrial conference, Wadi moved to dismiss the indictment and, in the alternative, sought a spoliation instruction due to Baker's failure to preserve the data on his original phone. The Government countered that any lost information was not deleted intentionally or for a

nefarious purpose—otherwise, Baker "would have bought the new phone, not have [his data] downloaded, and brought in basically an empty phone."

The district court denied Wadi's motion to dismiss and did not rule on Wadi's alternative request for a spoliation instruction. At trial, Wadi never renewed his request for such an instruction.

Wadi now argues that the district court violated his due process rights by denying his motion to sanction the Government by either dismissing his indictment or giving a spoliation instruction. But Wadi's due process argument lacks merit because he fails to show that the Government acted in bad faith, and "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). For similar reasons, Wadi also fails to show that the district court abused its discretion in denying his motion for sanctions.

While this court typically reviews a motion to dismiss an indictment *de novo*, *United States v. Suarez*, 966 F.3d 376, 382 (5th Cir. 2020), Wadi does not allege a legal deficiency with his indictment that requires dismissal. Rather, he contends that dismissal should have occurred as a form of sanction, which results in review for abuse of discretion. *Martinez*, 131 F.4th at 314 ("This court reviews a trial court's decision on a motion for sanctions for spoliation of evidence or its decision regarding a spoliation instruction for abuse of discretion.").

"If a party raises a claim of spoliation, 'a court may give an adverse-inference instruction' or sanction the party that altered or destroyed evidence upon a showing of bad faith." *Id.* at 315. "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Id.* (quotation marks omitted). In this case, the district court did not abuse its discretion in refusing to sanction the Government for Baker's

actions with his private cellphone. And even if Wadi had requested a spoliation instruction, the court would have been within its discretion to refuse one, given the lack of evidence of bad faith in general and the lack of any evidence specifically that the Government destroyed data. *See United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000). As with Wadi's other arguments on appeal, this issue lacks merit.

## III.

Wadi fails to show reversible error in either the district court's rulings related to witness testimony at trial or the court's instructions to the jury. His sufficiency-of-the-evidence claim lacks merit. And the court acted within its discretion by declining to dismiss the indictment or give a spoliation instruction as sanction for a Government witness's violation of a preservation order related to his cellphone.

For the foregoing reasons, Wadi's convictions are

AFFIRMED.